IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| LOIS S. RYAN, | ) | |
| | ) | |
| Plaintiff | ) | Civil No. 08-6398-HU |
| | ) | |
| v. | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

KATHRYN TASSINARI
Drew L. Johnson, P.C.
1700 Valley River Drive
Eugene, OR 97401
        Attorney for Plaintiff

DWIGHT C. HOLTON
Acting United States Attorney
ADRIAN L. BROWN
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2904

MICHAEL S. HOWARD
Special Assistant U.S. Attorney
Social Security Administration
701 Fifth Avenue, Suite 2900, M/S 901
Seattle, WA 98104-7075

     Attorneys for Defendant

HUBEL, Magistrate Judge:

     Plaintiff Lois Ryan ("Ryan") seeks judicial review of the Social Security Commissioner's final decision denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act") for the period prior to May 1, 2006. This court has jurisdiction under 42 U.S.C. § 405(g).

     For the following reasons, I recommend the Commissioner's decision be AFFIRMED.

## PROCEDURAL BACKGROUND

     Born in 1947 (Tr. 66), Ryan has a general equivalency degree (Tr. 75) and reports past work as an accounts payable clerk. Tr. 74. Ryan applied for DIB on February 27, 2004, alleging disability since June 1, 2001 (Tr. 66), due to insulin resistant diabetes, anxiety, panic attacks, tremors, neuropathy, fibromyalgia, "bowel problems," and memory problems. Tr. 73. The Commissioner denied Ryan's application initially and upon reconsideration. Tr. 37-46. An ALJ held a hearing on October 17, 2006 (Tr. 549-83), and subsequently found Ryan not disabled prior to May 1, 2006, but disabled as of that date. Tr. 25. Ryan presently appeals the Commissioner's finding that she was not disabled between June 1, 2001, and May 1, 2006.

///

///

///

2 - FINDINGS AND RECOMMENDATION

## FACTUAL BACKGROUND

**I.    Medical Evidence**

**A.    1999**

Treating gastroenterologist Dr. Brendler noted Ryan's "complex" medical history on October 8, 1999, citing her adult onset diabetes melilotus, colon surgeries in 1986 and 1996, and Ryan's own reports of multiple transient ischemic attacks ("TIAs") in 1998.  Tr. 210.  Dr. Brendler subsequently diagnosed abdominal pain and fever of uncertain etiology by history, chronic diarrhea, which she thought might be linked to Ryan's diabetes, and chronic leukocytosis.[1]  Tr. 209-11.  An abdominal CT study on October 12, 1999, showed fatty infiltration of the liver,  colon spasm, and evidence of prior surgeries.  Tr. 212.  On October 19, 1999, Ryan reported that she had experienced left-side abdominal pain for several months, and a colonoscopy showed a very spastic colon with some hypertrophy folds.  Tr. 207.  On November 2, 1999, Dr. Brendler diagnosed abdominal pain likely caused by a spastic colon.  Tr. 256.

**B.    2000**

Ryan was hospitalized in March 2000 for right side-weakness and ataxia.  Tr. 140.  An MRI showed small vessel disease without any new intracranial lesions.  *Id.*  Attending physicians diagnosed right-side weakness with unknown etiology, a urinary tract infection, a history of chronic leukocytosis, headache, hypertension, and type II diabetes.  Tr. 141.

Ryan presented to the Emergency Room on May 1, 2000, seeking treatment for an acute shoulder strain.  Tr. 385.  An X-ray was negative, and treating orthopedist Dr. Lundsgaard diagnosed

---

[1]Leukocytosis refers to an increased white blood cell count due to any cause. *Emedicine.com*, *available at* http://emedicine.medscape.com/article/956278-overview (last visited January 8, 2010).

left shoulder strain consistent with rotator cuff tendinitis.  Tr. 447.

On July 7, 2000, Ryan injured her right foot and fractured her big toe.  Tr. 446.  Dr. Lundsgaard prescribed a fracture boot.  *Id.*

Ryan again presented to the Emergency Room on October 29, 2000, complaining of abdominal pain; tests showed an elevated white blood count.  Tr. 386.  Ryan was admitted to the hospital and discharged on October 31, 2000.  Tr. 137-38.  Physicians cited Ryan's reported history of leukocytosis, and pointedly noted that Ryan failed to explain that this condition was benign.  *Id.* She was discharged with a diagnosis of probable constipation.  Tr. 137.

On December 4, 2000, Dr. Brendler performed a colonoscopy.  Tr. 204.  Dr. Brendler noted Ryan's history of colon cancer with resection surgery, and found no cancer recurrence.  *Id.*  She subsequently diagnosed abdominal pain with unclear etiology and stated, "I wonder about diabetic neuropathy related to pain."  *Id.*

**C.    2001**

On May 15, 2001, Dr. Brendler diagnosed diarrhea and found it "probably associated" with Ryan's chronic diabetes.  Tr. 202.

General practitioner and treating physician Dr. Bost diagnosed diabetes, chronic pain syndrome, chronic depression, and anxiety on December 5, 2001.  Tr. 334.  Dr. Bost also noted Ryan's history of leukocytosis.  Tr. 334.

**D.    2002**

Ryan presented to Dr. Bost on January 8, 2002, to discuss her chronic pain syndrome.  Tr. 335.  At this time Ryan reported that she "feels terrible" and "aches all over" and requested a pain patch.  *Id.*  Ryan also explained that she was applying for disability benefits, and wanted to discuss

fibromyalgia treatment.  *Id.*  Dr. Bost diagnosed diabetes under poor control, fibromyalgia, depression, and narcotic dependence.  Tr. 334-35.  Dr. Bost made no clinical findings or trigger-point testing in support of her fibromyalgia diagnosis, and also noted that Ryan "is aware that narcotics are generally not used for fibromyalgia."  *Id.*

Dr. Bost next treated Ryan on February 11, 2002, noting Ryan's reports of "burning" and "constant" pain in her back, neck, arms, legs.  Tr. 333.  Dr. Bost found Ryan "profoundly depressed," stating that Ryan's quality of life was very poor.  *Id.*  Dr. Bost subsequently diagnosed fibromyalgia, again without explanation or trigger-point testing, and "severe" depression.  Tr. 332.  Dr. Bost also characterized Ryan's experience as a "vicious cycle" of chronic pain and depression.  *Id.*

Ryan again presented to Dr. Bost "miserable and crying" on March 8, 2002.  Tr. 329.  Dr. Bost diagnosed diabetes, chronic pain syndrome, and depression.  *Id.*  Dr. Bost recommended that Ryan see a psychiatric mental health nurse practitioner for her mental health disorders, and recommended an MRI to follow-up on the previous MRI showing demyelinating disease.[2]  Tr. 330-31.

 On April 12, 2002, Dr. Bost diagnosed "severe" depression, but noted that Ryan was "better" and "is actually doing great."  Tr. 328.  Dr. Bost also diagnosed fibromyalgia, again without clinical trigger-point testing, which Dr. Bost also characterized as  "better."  *Id.*  On July 29, 2002,  Dr. Bost diagnosed chronic pain syndrome, chronic depression, anxiety disorder, fibromyalgia, restless legs syndrome, and pancreatitis.  Tr. 325.  Dr. Bost again diagnosed each of these conditions on October 16, 2002.  Tr. 321.  Dr. Bost stated here that Ryan would be "better off" without Benzodiazepine use, and prescribed neurotin for Ryan's diabetic neuropathy.  Tr. 326.

---

[2]This MRI is not in the record before this court.

5 - FINDINGS AND RECOMMENDATION

### E.    2003

Dr. Bost diagnosed fibromyalgia, again without indicating any clinical trigger-point testing, on January 20, 2003.  Tr. 317.  Dr. Bost's history cited diagnoses of hyperlipidemia, restless legs syndrome, chronic leukocytosis of unknown etiology, and an MRI "compatible with demyelinating disease noted several years ago."  Tr. 318.  Dr. Bost also diagnosed diabetes and chronic pain syndrome on this date.  Tr. 319.

On March 4, 2003, Ryan complained to Dr. Bost of a right-side headache, inability to walk and equilibrium problems.  Tr. 309.  She also stated that the right side of her face "feels funny."  *Id.*  Dr. Bost offered a differential diagnosis of "CVA[3] versus RIND[4] versus ischemia secondary to migraine headache."  Tr. 311.  Ryan was subsequently admitted to a hospital neurologic unit.  *Id.*

A March 4, 2003, MRI showed "probable small vessel changes."  Tr. 157.  A concurrent chest x-ray showed a normal size heart.  Tr. 158.

Attending physician Dr. Mathis examined Ryan on March 4, 2003, and noted that Ryan had developed right sided weakness on that date.  Tr. 153.  Dr. Mathis diagnosed "acute onset of right hemiparesis" and characterized his examination findings as "unusual."  *Id.*  Dr. Mathis concluded that non-organic defects and psychological causes should be considered.  *Id.*

An MRI conducted on March 6, 2003, showed small vessel changes, but no evidence of a new stroke.  Tr. 149.

_____

[3]"CVA" indicates "cerebral vascular accident," or stroke.  Kenneth N. Anderson et al. eds., *Mosby's Medical, Nursing, & Allied Health Dictionary* ( 5ᵗʰ ed. 1998).

[4]"RIND" indicates "reversible ischemic neurologic disability," which is similar to a TIA. *Medicine Online*, *available at* http://www.medicineonline.com/articles/R/2/Reversible-Ischemic-Neurologic-Disease-RIND/Transient-Ischemic-Attack.html (last visited January 8, 2010).

Ryan presented to the Emergency Room on March 23, 2003, complaining of knee pain. Tr. 160. An X-ray showed a fracture off the anterior spine of her tibia. Tr. 162. Ryan was instructed to wear a knee immobilizer and discharged. An April 1, 2003, CT scan showed a "nondisplaced incomplete" tibia fracture. Tr. 406.

Dr. Bost followed Ryan's left knee injury on May 20, 2003. Tr. 305. Dr. Bost also continued to diagnose diabetes and left leg fracture on July 8, 2003. Tr. 301. Here Dr. Bost noted Ryan's excessive Tylenol Three[5] use. *Id.*

On October 21, 2003, Ryan had a cardiac study and stress test, which showed normal ventricular function. Tr. 166. However, Ryan complained of chest pain in the course of testing and the study was not completed. Tr. 168.

Ryan sought treatment for diabetes and panic attacks in October 2003. On October 8, 2003, Ryan complained of panic attacks and chest discomfort. Tr. 297. Dr. Bost diagnosed panic attacks, diabetes, hyperlipidemia, and atypical chest pain. *Id.* Dr. Bost also suggested that Ryan obtain counseling for her panic attacks. *Id.* On October 23, 2003, Dr. Bost stated that Ryan's panic attacks were "better" and diagnosed diabetes, diabetic neuropathy, gastroesophegeal reflux disease, and "improved" panic attacks. Tr. 296.

Dr. Bost stated that Ryan was "feeling better" and had no further panic attacks on November 19, 2003. Tr. 291. Dr. Bost also stated that Ryan's blood sugars were "out of control" on this date. Tr. 292.

///

---

[5]"Tylenol Three" is composed of acetaminophen and codeine. *Drugs.com*, *available at*: http://www.drugs.com/mtm/tylenol-with-codeine-3.html (last visited January 8, 2010.

7 - FINDINGS AND RECOMMENDATION

### F.   2004

Dr. Bost performed a follow-up examination to address Ryan's diabetes on January 21, 2004. Tr. 285. Dr. Bost noted that Ryan was not following the recommended carbohydrate intake, and that she continued to smoke. *Id.* Dr. Bost diagnosed diabetes under poor control and recommended diabetic education and dietary modifications. *Id.* Dr. Bost also diagnosed peripheral vascular disease and tobacco abuse. *Id.*

Ryan failed to attend an appointment on January 29, 2004. Tr. 260.

Dr. Bost noted that Ryan looked ill and continued to smoke on March 10, 2004. Tr. 280. Dr. Bost diagnosed bronchitis, sinusitis, otitits media, and dehydration. Tr. 281. Dr. Bost also warned Ryan to "be careful" using Tylenol with codeine.

On April 9, 2004, Ryan complained of a "fractured rib" at an appointment that was scheduled to address Ryan's diabetes. Tr. 278. Dr. Bost diagnosed right anterior rib pain, with a possible fracture, and diabetes with multiple complications and poor control. *Id.*

Dr. Bost diagnosed "difficulty with memory," confusion, and disequilibrium on June 14, 2004. Tr. 273. Dr. Bost noted that Ryan continued to smoke against medical advice (Tr. 272), and also stated that Ryan "appears drugged." Tr. 273. Dr. Bost referred Ryan for a neuropsychological consult. Dr. Bost diagnosed fatigue, malaise, "out of control" diabetes, ataxia, and diabetic neuropathy with foot pain on July 21, 2004. Tr. 267.

Ryan failed to show for neuropsychological testing on July 27, 2004 (Tr. 271), and again on August 3, 2004. Tr. 259. Ryan cancelled her appointment to attend diabetic education classes on August 6, 2004, and stated that she did not want to reschedule. Tr. 258.

On August 10, 2004, Dr. Bost wrote a letter stating that Ryan cannot engage in any

employment. Tr. 256. In support of this conclusion, Dr. Bost cited Ryan's history of depression, fibromyalgia with chronic pain syndrome, unstable diabetes melilotus, "severe" anxiety, problems with confusion and memory, difficulties with balance and falls, and diabetic complications, including peripheral neuropathy. *Id.* She also stated that Ryan may have experienced strokes or be in the early stages of Alzheimer's disease. *Id.*

On September 24, 2004, Dr. Bost again diagnosed diabetes, hyperlipidemia, and fibromyalgia. Tr. 490. Dr. Bost did not document any clinical trigger-point testing in support of her fibromyalgia diagnosis. *Id.*

Ryan complained of foot pain on October 15, 2004, which a Nurse Practitioner assessed as probable gout. Tr. 488. On October 18, 2004, Dr. Bost examined a lump on Ryan's head and found it infectious. Tr. 493.

Examining physician Dr. Verhey assessed Ryan for Disability Determination Services ("DDS")[6] on October 24, 2004. Tr. 341-45. Dr. Verhey noted Ryan's reported activities of daily living and her reports of depression, and observed Ryan's slow gait and difficulty with balancing herself. Tr. 342-43. Dr. Verhey also performed a mini mental status exam, which showed intact functioning and no loss of short-term memory. Tr. 344. Dr. Verhey diagnosed disequilibrium of unknown etiology and weakness due to deconditioning. Tr. 344-45.

Regarding Ryan's reported memory problems, Dr. Verhey stated that Ryan's memory was normal for her age and also noted that her medications may effect her memory. Tr. 344. Dr. Verhey limited Ryan to standing and walking for three hours in an eight-hour day (*Id.*) and sitting for six

---

[6] DDS is a federally-funded state agency that makes eligibility determinations on behalf and under the supervision of the Social Security Administration pursuant to 42 U.S.C. § 421(a) and 20 C.F.R. § 404.1503.

hours in an eight-hour day.  Tr. 345.  Finally, Dr. Verhey stated that Ryan would need an assistive device for long distances or uneven surfaces only.  *Id.*

Ryan established treatment with a new physician, Dr. Moser, on October 25, 2004.  Tr. 485. Ryan complained of foot pain, and Dr. Moser ordered a variety of laboratory tests and an MRI of the lumbar spine.  Tr. 487.  Dr. Moser did not make any notes regarding fibromyalgia at this visit (Tr. 485-87), and he expressed concern about Ryan's extensive list of medications.  *Id.*

Psychologist Dr. Northway performed a neuropsychological examination on November 1, 2004.  Tr. 346.  Dr. Northway found that Ryan's memory testing showed average and high average abilities.  Tr. 349.  Dr. Northway also noted that Ryan appeared depressed and anxious, and assessed a GAF of 55-65 with diagnoses of major depressive disorder and adjustment disorder with anxiety. Tr. 350.  Dr. Northway finally assessed a rule-out diagnosis of cognitive disorder.  *Id.*

Ryan continued to complain of foot pain on November 18, 2004.  Tr. 481.  Here Dr. Moser noted Ryan's long medication list and the 2001 date that Ryan last worked.  *Id.*  Dr. Moser diagnosed foot pain, peripheral neuropathy, diabetes, depression, hypertension, hyperlipidemia, and "evidence of leukocytosis." Tr. 482-83.  On December 20, 2004, Dr. Moser found fractures in both of Ryan's feet.  Tr. 479-80.

**G.    2005**

On January 21, 2005, Dr. Moser continued to diagnose insulin-dependent diabetes, hypertension, hyperlipidemia, peripheral neuropathy, leukocytosis, and foot fractures.  Tr. 478. Ryan complained of a burning sensation in her feet on March 22, 2005, after jumping off a wall two months earlier.  Tr. 475.  Dr. Moser again diagnosed diabetes, depression, and foot fractures on this date.  *Id.*  On May 5, 2005, Dr. Dr. Moser noted that Ryan was taking close to twenty different

medications, and diagnosed diabetes under sub-optimal control, chronic obstructive pulmonary disease ("COPD"), hypertension, depression, peripheral neuropathy, and leukocytosis. Tr. 473-74. Dr. Moser noted Ryan's complaint that her hands "locked up," with lumps on her palms, on July 22, 2005. Tr. 471.

Ryan sought treatment from orthopedist Dr. Fitzpatrick for her bilateral trigger-finger conditions in August and September 2005. Tr. 438-41. Dr. Fitzpatrick performed a left-hand trigger finger release operation on September 20, 2005. Tr. 407. A follow-up examination on October 3, 2005, showed no active triggering of the left hand and suggested that surgery was indicated for the right hand. Tr. 436. A second trigger-finger release operation was performed on the right hand on October 7, 2005. Tr. 435. A follow-up examination on October 24, 2005, showed that Ryan was "doing well" and made no indication that the either operation was ineffective. Tr. 434.

Ryan fractured her ankle on November 3, 2005. Tr. 432. Ryan reported to Emergency Room physicians that she tripped and fell while "out delivering papers." *Id.* Dr. Fitzpatrick performed an open reduction on Ryan's right ankle fracture on November 15, 2005 (Tr. 409), and Ryan received follow up care for this injury throughout November and December 2005. Tr. 424-32.

Ryan complained of left superior anterior chest pain to a nurse practitioner in Dr. Moser's clinic on November 28, 2005. Tr. 469. The nurse practitioner suspected the pain was musculoskeletal, but also noted that Ryan was at high risk for a pulmonary embolism and suggested further work-up because of this risk. *Id.*

On December 14, 2005, Dr. Moser noted Ryan's history of diabetes, hyperlipidemia, depression, COPD with continued smoking, and benign leukocytosis. Tr. 467. Dr. Moser also diagnosed peripheral neuropathy and prescribed neurotin and Klonopin for this condition. Tr. 468.

**H.    2006**

Ryan attended a follow-up appointment for her right ankle fracture on February 15, 2006. Tr. 464.  At this time Dr. Moser also diagnosed diabetes, COPD, hypertension, hyperlipidemia, leukocytosis with benign etiology, and depression.  Tr. 465.

Ryan attended physical therapy for her right ankle fracture between March 10, 2006, and April 21, 2006. Tr. 414-19; 423.  Treatment was discontinued because Ryan met clinical goals.  Tr. 414.

In May 2006 Dr. Fitzpatrick performed a cortisone injection on Ryan's left ring trigger finger. Tr. 421.  He also assessed Ryan's right ankle fracture as "stationary" on this date, and stated that he believed her residual complaints were due to her diabetic neuropathy.  Tr. 422.

Dr. Moser continued to treat Ryan throughout 2006.  On March 15, 2006, he diagnosed diabetes, COPD with continued smoking, hypertension, hyperlipidemia, and leukocytosis.  Tr. 457-59.  Dr. Moser repeated these diagnoses on May 15, 2006, also noting that Ryan continued to experience left-hand trigger-finger symptoms. Tr. 452. On June 12, 2006, Dr. Moser again repeated these diagnoses and noted that Ryan complained of left rib pain.  Tr. 452.  On July 10, 2006, Dr. Moser noted Ryan's diabetes under suboptimal control, COPD with continued smoking, hyperlipidemia, and benign leukocytosis.  Tr. 450.

Dr. Moser diagnosed diabetes, COPD, and depression on October 13, 2006.  Tr. 544. Treating physician and family practitioner Dr. Torguson wrote a letter on August 22, 2006.  Tr. 542. He stated that Ryan was a new patient, that her diagnoses included "refractory depression," and that she was unable to walk.  *Id.*

On October 13, 2006, orthopedist Dr. Fitzpatrick wrote that Ryan had a history of an ankle

12 - FINDINGS AND RECOMMENDATION

fracture, but that she could work.  Tr. 547.

## II.    Ryan's Testimony

### A.        Activities of Daily Living Report

Ryan completed an "Activities of Daily Living and Socialization" form for DDS on March 13, 2004.  Tr. 92-98.  Ryan first stated that she requires help getting out of the tub while bathing and while washing her back, and that she has to sit down to dress.  Tr. 92.  She also stated that she has diminished appetite and will forget to eat some days.  Tr. 93.  Ryan indicated that, with help from her husband, she does laundry weekly, loads a dishwasher daily, sweeps her small kitchen weekly, but finds it difficult to mop and vacuum.  *Id.*

Ryan wrote that she does "less," requires help, and that, due to tremors, has a fear of falling.  Tr. 94.  She stated that she can no longer remember what she reads due to memory loss.  Tr. 95.  Ryan wrote that she watches television seven to eight hours per day, and that she can cross stitch and paint for ten minutes per week each.  *Id.*  She explained that she cannot paint or sew very often due to tremors or pain.  Tr. 96.  Finally, she wrote that she no longer goes to church because she has no bowel control and does not have a car.  *Id.*

### B.        Fatigue Questionnaire

Ryan also completed a DDS "Fatigue Questionnaire" on March 15, 2004.  Tr. 108-11.  Ryan first wrote that she usually naps two or three times per day for thirty minutes to three hours, and that this limits "anything I want to do."  Tr. 108.  She stated that she must rest after filling the dishwasher, and that she requires rest after being active for forty-five minutes to an hour.  *Id.*  She also wrote that her husband carries laundry to the washing machine for her, and that she cannot carry laundry herself due to pain.  *Id.*  She walks one-half block daily to the mailbox.  Tr. 109.  Ryan

indicated that she cleans her home and cooks daily, and does weekly laundry and shopping.  Tr. 109.

Ryan explained that on a typical day she gets up, has coffee, "picks up" around the house, watches TV, loads the dishwasher, naps, and sits in her chair to rest.  Tr. 110.  She also makes dinner with her husband's help, and tries to sit in the sun outside.  *Id.*  She stated that she has no problems sleeping, but has to get up several times in the night to change her Depends due to bowel incontinence, and consequently usually sleeps about six hours per night.  *Id.*

Finally, Ryan indicated that she can walk "zero" hours, stand and sit for one hour, can never bend or lift any weight, and can occasionally reach.  *Id.*

### C.    Work History

Ryan additionally completed a Work History Report on March 15, 2004.  Tr. 116-21.  Ryan reported work as an accounts payable clerk for a retail employer between May 1983 and May 1987. Tr. 116.  Ryan also reported work as an accounts payable clerk for a timber sales company between May 1994 and June 2001.  *Id.*  Ryan explained that she paid invoices in both positions and lifted and carried boxes of paid invoices weighing less than ten pounds.  Tr. 117-18.

### D.    Hearing Testimony

Ryan testified at her October 17, 2006, hearing before the ALJ.  She stated that she is an "uncontrolled diabetic," and that she has neuropathy in her feet and hands and severe depression. Tr. 553.  Ryan stated that she is receiving narcotic medication for her fibromyalgia, but, upon questioning, said that she was unsure whether the medication was for her fibromyalgia or pain stemming from her neuropathy.  Tr. 553-54.

Ryan testified that her hand surgeon (Dr. Fitzpatrick) diagnosed her with neuropathy when he performed surgery on her hands.  Tr. 554.  She also stated that this condition has worsened in the

last couple of years.  *Id.*

In response to questioning from her attorney, Ryan stated that she last worked in June 2001, but that she probably could have worked in the following year.  Tr. 555.  Ryan also again stated that the neuropathy in her hand progressively worsened in the two years preceding her hearing, between August 2004 and October 2006.  Tr. 556.

Ryan explained that treating physicians Dr. Moser and Dr. Bost prescribed narcotic medications for her pain.  Tr. 557-58.  She also explained that she was first depressed about five years ago, and that she is presently taking Seroquel and Zoloft for depression.  Tr. 558-59.

Ryan stated that on a typical day she gets up and tries to "pick up the house as best I can" and then usually naps before lunch.  Tr. 560-61.  Following lunch she naps again and goes to bed "by 7:00."  Tr. 561.  Ryan said that her naps last between one and two hours.  *Id.*

Regarding her trigger finger condition, Ryan stated that her left-hand ring finger is "pretty much" contracted and that she had surgery on her two left-hand middle fingers, but not on her ring finger.  Tr. 562-63.  Ryan also testified that she cannot independently zip her pants because of her hand dysfunction.  Tr. 570.

Finally, Ryan also testified that she wears protective garments daily due to incontinence.  Tr. 568.

## III.    Vocational Expert's Testimony

A vocational expert testified at Ryan's October 17, 2006, hearing.  Tr. 579-81.  The vocational expert stated that Ryan could perform her past relevant work as an accounts payable clerk if she was limited to sedentary work with restroom access.  Tr. 579-80.  However, the vocational expert continued that, with the addition of limited left-hand fingering in a right-handed individual,

Ryan could not perform this work.  Tr. 580.   The vocational expert subsequently stated that, with any left-hand limitation, Ryan had no transferable skills.  Tr. 580A.

## DISABILITY ANALYSIS

The Commissioner engages in a sequential process encompassing between one and five steps in determining disability under the meaning of the Act.  20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity.  If she is, the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(i).  At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the twelve month duration requirement.  20 C.F.R. § 404.1509; 404.1520(a)(4)(ii).  If the claimant does not have such a severe impairment, she is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment medically meets or equals a "listed" impairment in the regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If the determines that the impairment meets or equals a listed impairment, the claimant is disabled.

If adjudication proceeds beyond step three the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  This evaluation includes assessment of the claimant's statements regarding her impairments.  20 C.F.R. § 404.1545(a)(3).  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite limitations imposed by her impairments.  20 C.F.R. § 404.1520(e); Social Security Ruling ("SSR") 96-8p.

The ALJ uses this information to determine if the claimant can perform his past relevant work at step four.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant can perform his past relevant

work, she is not disabled.  If the ALJ finds that the claimant's RFC precludes performance of her past relevant work the ALJ proceeds to step five.

At step five the Commissioner must determine if the claimant is capable of performing work existing in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(f); *Yuckert*, 482 U.S. at 142; *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999).  If the claimant cannot perform such work, she is disabled.  *Id.*

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F.3d at 1098.  If the process reaches the fifth step, the burden shifts to the Commissioner to show that "the claimant can perform some other work that exists in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience."  *Id.* at 1100.  If the Commissioner meets this burden the claimant is not disabled.  20 C.F.R. §§  404.1566, 404.1520(g).

## THE ALJ'S FINDINGS

At step one the ALJ found that Ryan had not performed work activity during the relevant period.  Tr. 16.  The ALJ found Ryan's diabetes and fibromyalgia severe at step two.  Tr. 16.  The ALJ also found that "the claimant has short periods of depression as well as, beginning in May 2006, an exacerbation of trigger finger."  *Id.*

Before continuing her analysis, the ALJ pointedly found that Ryan "has been noncompliant with medical direction" since her alleged onset date.  Tr. 20.  The ALJ subsequently found that Ryan's impairments did not meet or equal a Listing at step three.  *Id.*

The ALJ made the following RFC finding for the period between Ryan's June 1, 2001, onset date and May 2006:

> [T]he claimant had the residual functional capacity to perform a wide range of sedentary exertional work. Lifting was limited to 10 pounds occasionally and less than 10 pounds frequently. The claimant could stand/walk at least two hours in an eight-hour day. The claimant could sit for about six hours in an eight-hour day. The claimant required an environment with little exposure to vibration, due to possible diabetic neuropathy which might be aggravated. Climbing of ladders, ropes, and scaffolds was precluded. Climbing of ramps or stairs was limited to an occasional basis. Balancing, crawling, and kneeling were limited to an occasional basis. Due to bowel incontinence, the claimant required easy restroom access.

Tr. 21.

However, the ALJ also found that, beginning on May 1, 2006, Ryan was limited to a reduced range of sedentary exertional work. Tr. 23. Here the ALJ found Ryan's allegations concerning her symptoms "somewhat credible" beginning on May 1, 2006. *Id.*

The ALJ bifurcated her findings at step four. The ALJ first concluded that Ryan could perform her past relevant work between Ryan's June 1, 2001, onset date and May 1, 2006. *Id.* This results in a finding that Ryan was not disabled prior to that date. 20 C.F. R. § 404.1520(a)(4)(iv). However, the ALJ then found that Ryan could not perform her past relevant work after May 1, 2006. Tr. 24.

The ALJ subsequently found that Ryan was an individual of "advanced age" under the Commissioner's regulations, and had no transferable skills. *Id.* The ALJ therefore found that Ryan was unable to perform work in the national economy at step five as of May 1, 2006. *Id.*

In conclusion, the ALJ found Ryan not disabled prior to May 1, 2006, but disabled as of that date. Tr. 25.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42

U.S.C. § 405(g); *Batson v. Commissioner for Social Security Administration*, 359 F.3d 1190, 1193 (9th Cir. 2004).  This court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)(citing *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)).  The reviewing court may not substitute its judgment for that of the Commissioner.  *Id.* (citing *Robbins v. Social Security Administration*, 466 F.3d 880, 882 (9th Cir. 2006)), *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).  Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading.  *Id.*, *see also Batson*, 359 F.3d at 1193.

### DISCUSSION

Ryan challenges the ALJ's step two findings, her evaluation of Ryan's credibility, and her evaluation of two treating physicians.

### I.      The ALJ's Step Two Findings

Ryan asserts that the ALJ erroneously evaluated her alleged mental impairments at step two. Pl.'s Opening Br., 12.   Ryan does not specify what impairment the ALJ omitted, but discusses her alleged memory impairment and concludes that her mental impairments "affect and limit her ability to perform substantial gainful activity."  Pl.'s Opening Br., 14.

At step two, the ALJ determines if the claimant has a "severe" impairment.  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is "severe" if it "significantly limits your ability to do basic work activities."  20 C.F.R. § 404.1520(c); *see* also 20 C.F.R. § 404.1521.  Such an impairment must last, or be expected to last, twelve months.  20 C.F.R. § 404.1509.  However, the ALJ's analysis at steps four and five must consider all of a claimant's impairments, both severe and non-severe.  20 C.F.R. § 404.1545(a)(2).

The ALJ found Ryan's depressive episodes severe at step two.  Tr. 16.  The ALJ discussed Ryan's alleged memory difficulties, and found them unsupported by mental status testing conducted by examining physician Dr. Verbey and examining psychologist Dr. Northway.  Tr. 18.  The record supports this finding.  Both Dr. Verbey and Dr. Northway found Ryan's memory test results to be within normal limits.  Tr. 344, 349.  Dr. Northway additionally found that some of Ryan's memory tests showed "above average" abilities.  Tr. 349.  The ALJ's finding that Ryan's alleged memory deficits are non-severe is based upon the record and should be affirmed.

Furthermore, because the ALJ proceeded beyond step two in the sequential analysis any step two omission is inconsequential.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (holding an ALJ's step two omission harmless when the ALJ proceeded beyond step two in the sequential analysis).  The ALJ's step two findings should therefore be affirmed for this reason as well.

## II.    Ryan's Credibility

Ryan asserts that the ALJ erroneously found her not credible.  The ALJ found Ryan's statements pertaining to her symptoms before May 1, 2006, "not entirely credible," (Tr. 22) but found Ryan's statements pertaining to her symptoms after that date "somewhat credible."  Tr. 23.

### A.    Credibility Standard

Once a claimant shows an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged," absent a finding of malingering, the ALJ must provide "clear and convincing" reasons for finding a claimant not credible.  *Lingenfelter,* 504 F.3d at 1036 (citing *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)).  The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony."  *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (citing

*Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (en banc)).   The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations.  *Smolen*, 80 F.3d at 1284.  The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant.  *Id.*  Once a claimant establishes an impairment, the ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence."  *Robbins*, 466 F.3d at 883.

**B.   Credibility Analysis**

The ALJ based her finding that Ryan was not credible prior to May 1, 2006, upon internal inconsistencies in Ryan's statements, Ryan's activities of daily living, and her medical record.  Tr. 22.  The ALJ also found that Ryan was non-compliant with recommended treatment.  Tr. 20.

**a.   Inconsistent Statements and Activities of Daily Living**

The ALJ found that Ryan made inconsistent statements regarding her alleged limitations and her activities of daily living.  Tr. 22.  Here the ALJ noted that "although she reported that she can never lift . . . and has memory difficulties, she reports driving independently, preparing her own meals, putting dishes in the dishwasher, cleaning her house, doing laundry, sewing, going to yard sales, shopping, paying bills, and using the computer."  *Id.*

The ALJ's credibility analysis may cite a claimant's inconsistent statements regarding symptoms.   *Smolen*, 80 F.3d at 1284.  The ALJ may also find a claimant not credible where her activities of daily living exceed the claimant's indicated limitations.  *Id.*

The record supports the ALJ's findings.  Ryan's reports to DDS show that she does weekly

laundry and shopping, cooks and loads the dishwasher daily, sweeps her kitchen weekly, watches television seven or eight hours per day, and walks one-half block daily to the mailbox. Tr. 93, 95, 109. Ryan also wrote that she can walk "zero" hours, and can never bend or lift any weight. Tr. 110. The ALJ's finding that Ryan made contradictory statements regarding her abilities to bend and walk is thus based upon the record.

Ryan also indicated that she naps for several hours each day. Tr. 108, 560-61. The ALJ found that this was not required due to a medical impairment. Tr. 22. No medical source endorsed Ryan's alleged need to nap two or three times per day, with each session lasting between thirty minutes and three hours, as a result of her symptoms. While the ALJ may not reject a claimant's symptom testimony once she has shown a medically determinable impairment that could "reasonably cause" the reported symptoms, the claimant must show a causal link between the impairment and the symptoms. *Smolen*, 80 F.3d at 1283. Ryan has established that she has impairments that could cause fatigue. However, the ALJ must then consider "any measures other than treatment" that the claimant uses to relieve symptoms. SSR 96-7p at *3 (available at 1996 WL 374186). Ryan has not shown that a medically determinable impairment requires her to nap to the extent she describes, or that such napping would relieve her symptoms. The ALJ's finding is therefore appropriately based upon the record and should be affirmed.

### b. Medical Record and Credibility

The ALJ's credibility analysis found that Ryan's allegations "are disproportionate to the objective findings in the medical record." Tr. 22. Once a claimant has established an impairment the ALJ may not reject a claimant's symptom testimony based upon the medical record alone, *Robbins*, 466 F.3d at 883, but the ALJ's credibility analysis may discuss a claimant's treatment

22 - FINDINGS AND RECOMMENDATION

record and physician observations. *Smolen*, 80 F.3d at 1284. Here the ALJ noted normal neuropsychological testing, the limited duration of acute conditions such as Ryan's foot fractures, and reports of treating and examining physicians prior to May 1, 2006. Tr. 22-23. Such references are appropriate in conjunction with other credibility findings. *Smolen*, 80 F.3d at 1284. The record supports this finding. Ryan's memory and cognitive testing was normal on November 1, 2004. Tr. 349. Ryan first complained of foot pain on October 15, 2004 (Tr. 488), and physicians last noted foot fractures on March 22, 2005. Tr. 475. Finally, no treating or examining physician suggested that Ryan was disabled prior to May 1, 2006. The ALJ's references to the medical record are based upon the record, and the ALJ's reasoning that the medical record detracts from Ryan's credibility should be affirmed in conjunction with her other credibility findings.

### c.    Failure to Follow Treatment

The ALJ also pointedly cited Ryan's repeated refusal to attend diabetic education classes and her continued smoking against medical advice (Tr. 20), and again cited this behavior in discussing Ryan's credibility. Tr. 22-23. The ALJ also found that Ryan provided no acceptable reasons for failing to follow treatment. Tr. 22.

The ALJ may find a claimant not credible for failing to follow recommended treatment without good reason. *Smolen*, 80 F.3d at 1280. This analysis extends to a claimant's decision to continue smoking against medical advice. *Bray v. Barnhart*, 554 F.3d 1219, 1227 (9th Cir. 2009). Ryan now asserts that the ALJ may consider a claimant's failure to follow treatment only if such failure would restore the claimant's ability to work. Pl.'s Opening Br. 17 (citing 20 C.F.R. § 404.2530(a)). This submission ignores the ALJ's authority to consider failure to follow treatment in the course of finding a claimant not credible.

The ALJ's credibility decision properly noted that Ryan did not follow suggested treatment, specifically diabetic education classes and smoking cessation.   Tr. 22-23.   The record clearly supports this finding (Tr. 258-59, 272, 280, 285, 450, 457, 467, 473-74) and it should therefore be affirmed.

### C.    Credibility Conclusion

The ALJ properly found Ryan not credible based upon her inconsistent statements, activities of daily living, and failure to follow treatment.   These findings should be affirmed.

## III.    Medical Source Statements

Ryan claims the ALJ erroneously evaluated limitations assessed by treating physicians Drs. Bost and Moser.

### A.    Standards

Generally, the ALJ must accord greater weight to the opinion of a treating physician than that of an examining physician.   *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).   If two opinions conflict, an ALJ must give "specific and legitimate reasons" for discrediting a treating physician in favor of an examining physician.   *Id.*, at 830.   The ALJ may reject a physician's opinion that is unsupported by clinical notes or findings.   *Bayliss*, 427 F.3d at 1216.

### B.    Physician Opinions

#### a.    Treating Physician Dr. Bost

Ryan asserts that the ALJ improperly rejected treating physician Dr. Bost's August 10, 2004, letter stating that she should immediately be awarded disability benefits.   Pl.'s Opening Br. 14 (citing Tr. 256).

Dr. Bost stated that Ryan was "unable to engage in gainful employment in any capacity on

a full time basis due to multiple medical problems." Tr. 256.  Dr. Bost subsequently listed Ryan's diagnoses as severe depression, fibromyalgia "with chronic pain syndrome," unstable insulin dependent diabetes, "extreme restless leg syndrome that interferes with restorative sleep," severe anxiety, problems of memory and confusion "which may be secondary to multiple strokes or early Alzheimer's disease," difficulty with balance and falls, and diabetic complications with peripheral neuropathy "which make it impossible to do fine motor movements." *Id.*

The ALJ discussed Dr. Bost's letter at length and assigned it "minimal weight." Tr. 19.  The ALJ first noted that disability opinions are reserved for the Commissioner. *Id.*  This assertion is correct.  20 C.F.R. § 404.1527(e)(1).

The ALJ also found Dr. Bost's opinion regarding Ryan's depression unsupported by the record.  Tr. 19.  The record supports this finding.  Dr. Bost noted that Ryan was "miserable and crying" on March 8, 2002 (Tr. 329), and diagnosed depression between December 2001 and October 2002.  Tr. 321, 325, 328-29, 332-35.  Dr. Bost did not diagnose depression after October 2002 in any of thirteen visits with Ryan between January 2003 and October 2004.  Tr. 267, 273, 278, 281, 285, 291, 296-97, 301, 305, 317, 490, 493.  The record shows that Dr. Bost diagnosed Ryan with "severe" depression on April 12, 2002, but also characterized Ryan as "better" and "doing great" on that same date.  Tr. 328.  This is inconsistent.  Finally, Dr. Bost made no explanation for her findings that Ryan was depressed, and Dr. Bost's August 10, 2004, statement did not explain how Ryan's allegedly severe depression precluded work activity.  The record thus reflects the ALJ's finding that Dr. Bost's opinion regarding Ryan's depression was unsupported by the record.

The ALJ also found that Dr. Bost relied upon Ryan's self-reporting regarding the severity of her depression and anxiety.  Tr. 19.  The ALJ may reject physician opinions predicated upon the

25 - FINDINGS AND RECOMMENDATION

reports of claimed deemed not credible. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). The ALJ properly found Ryan not credible, and therefore properly rejected Dr. Bost's opinion to the extent that it was based upon Ryan's self-reporting.

Regarding Dr. Bost's citation to Ryan's alleged memory difficulties, the ALJ found that neuropsychological testing showed that Ryan's memory was intact. Tr. 18. The record supports these findings. As noted, examining physician Dr. Verbey and examining psychologist Dr. Northway found Ryan's memory functioning to be within normal limits. Tr. 334, 349. Further, nothing in the record supports Dr. Bost's speculation that Ryan may be experiencing early Alzheimer's disease.

The ALJ also discussed Dr. Bost's chart notes, noting that Dr. Bost's notes documented Ryan's foot pain, but did not discuss upper extremity pain, and no neurologic deficits other than an abnormal gait. Tr. 19. This finding is supported by the record. Dr. Bost noted Ryan's report of burning pain in her arms and legs on February 11, 2002, made no other findings regarding Ryan's upper extremities. Tr. 333. Dr. Bost noted ataxia with foot pain on July 21, 2004. Tr. 267. Dr. Bost made no other properly supported findings that Ryan has difficulty with balance. The ALJ may reject a physician opinion unsupported by clinical notes or records, *Bayliss*, 427 F.3d at 1216, and the ALJ's rejection of Dr. Bost's opinion regarding Ryan's upper extremities and balance should be affirmed.

The ALJ's findings regarding Dr. Bost's clinical notes and her August 2004 letter are thus based upon the record. The ALJ accepted Ryan's limitations due to her diabetes and fine motor skills. Ryan shows no work-related limitations arising from her restless legs syndrome, and the ALJ properly rejected Dr. Bost's remaining limitations. For the reasons articulated above, the ALJ's

assignment of "minimal weight" to Dr. Bost's letter should be affirmed.

        **b.**    **Treating Physician Dr. Moser**

Finally, Ryan asserts that the ALJ should have credited treating physician Dr. Moser's August 11, 2006 statement that Ryan would be unable to work.  Pl.'s Opening Br. 16.  Ryan does not point to specific error, but asks this court to infer that Dr. Moser's August 2006 statement establishes that she could not work prior to her May 1, 2006 disability onset found by the ALJ.  *Id.*  Ryan reasons that, because Dr. Moser's August 2006 statement did not cite Ryan's left-hand trigger finger, Dr. Moser's statement establishes that Ryan was disabled before the May 1, 2006 date that the ALJ found that Ryan's trigger finger, in addition to her other impairments, resulted in disability.

Dr. Moser's August 11, 2006 chart note states "It is my medical opinion that the patient has a multitude of medical issues and problems which result in disability.  I do not feel that she will be able to seek gainful employment due to her diabetes, hyperlipidemia, hypertension, leukocytosis and depression."  Tr. 545.

The ALJ noted that Ryan transferred her care to Dr. Moser in 2004.  Tr. 20.  The ALJ also cited Dr. Moser's notes stating that Ryan was noncompliant in obtaining diabetes education and associated treatment and that Ryan continued to smoke against medical advice.  *Id.*  This finding is based upon the record, as discussed above.  *Supra*, 23-34.

 Ryan does not presently establish that the diagnoses cited by Dr. Moser in his August 11, 2006 chart note – depression, diabetes, hypertension, and benign leukocytosis – establish disability prior to May 1, 2006.  Finally, and most crucially, Dr. Moser himself did not say that these impairments rendered Ryan disabled prior to May 1, 2006.  Ryan's submission regarding Dr. Moser's August 11, 2006 disability opinion is therefore not based upon the record in this regard.

For all of these reasons, Ryan fails to establish that Dr. Moser's August 11, 2006 chart note shows that she was disabled between June 1, 2001, and May 1, 2006.

## CONCLUSION

The ALJ properly found Ryan not credible during the relevant period. The ALJ also properly evaluated the medical evidence now challenged by Ryan. For these reasons the ALJ's decision should be affirmed.

## RECOMMENDATION

The Commissioner's decision that Ryan did not suffer from disability prior to May 1, 2006, and is not entitled to benefits under Title II of the Social Security Act prior to this date is based upon correct legal standards and supported by substantial evidence. The Commissioner's decision should be AFFIRMED.

## SCHEDULING ORDER

The above Findings and Recommendation are referred to a United States District Judge for review. Objections, if any, are due April 16, 2010. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, any party may file a response by April May 3, 2010. Review of the Findings and Recommendation will go under advisement when the response is due or filed, whichever date is earlier.

IT IS SO ORDERED.

DATED this 29th day of March, 2010.

/s/ Dennis J. Hubel

_____
Dennis James Hubel
United States Magistrate Judge

28 - FINDINGS AND RECOMMENDATION